In the matter of the estate of MICHAEL G. KUHN, deceased.

[Decided May 4th, 1934.]

On appeal from a decree of the prerogative court advised by Vice-Ordinary Fielder, who filed the following opinion:

"The decedent died December 5th, 1932. He was ninety-one years old and had been totally blind twenty-five years. He left him surviving a wife, eighty-four years old, mentally

weak several years and subsequently committed to an insane asylum; also, by his first wife, a child—a married daughter who had lived with him the greater part of her life and had kept house for him and her stepmother several years, and a granddaughter. He had no children by his second wife. His alleged will dated December 1st, 1932, admitted to probate after a contest in the court below, gives his entire estate to his wife absolutely.

"Notwithstanding that the decedent had a weak heart and a greatly enlarged prostate, he had been in fairly good physical and mental condition for a man of his years up to the middle of November, 1932, but thereafter his prostatic condition grew materially worse, uremic poisoning and arteriosclerosis developed and he was forced to bed November 27th and remained there until he died. Several days prior to November 27th he had arranged with Mr. Schellhorn, a friend with whom he had recently transacted insurance business, to draw a will for him and although that will was drafted and Schellhorn called at his home November 30th and daily thereafter up to December 4th, it was not executed because Schellhorn could not find the decedent in fit mental condition.

"On the evening of December 1st, Mrs. Taylor and her mother, Mrs. Cowan, called at decedent's home. Mrs. Cowan is a daughter of Mrs. Allen, who is a sister of decedent's widow. The decedent had relied on Mrs. Cowan and Mrs. Taylor for advice and help in business matters to which he could not himself attend by reason of his loss of sight. They say they came that night in response to a telephone call from Mrs. Albers, decedent's daughter, to act as witnesses to the Schellhorn will, or to see that it set out the blind man's wishes. Mrs. Taylor had been employed in law offices and had had experience in preparing wills. She and Mrs. Cowan say that after waiting some time that night for Schellhorn to appear, they were informed by Mrs. Albers that he was not coming until the following day and that Mrs. Taylor then said to decedent that she could draw a will for him and he told her to do so; that she thereupon drew the will in controversy, setting down therein what decedent said he wanted;

that after the will was written, Mrs. Taylor read it to the decedent; that he was fully able to converse on the subject of his estate and its disposition and approved the will as drawn and read to him; that he then signed by mark, Mrs. Taylor guiding his hand, and that they signed as witnesses, no one else being present. Mrs. Taylor took the will away with her and kept its execution secret until it was delivered to their lawyer to offer for probate.

"It should be noted that the story told by Mrs. Cowan and Mrs. Taylor is not corroborated in any particular and that they have a highly probable money interest in sustaining the will, because under it decedent's widow will take the entire estate and, being an incompetent, she will die intestate, without issue and Mrs. Allen, aged eighty-six, as the widow's sister and next of kin and heir at law will take, or should Mrs. Allen predecease the widow, then upon the latter's death Mrs. Cowan will take. I doubt their story for the following reasons:

"1. Mrs. Albers testified that Mrs. Cowan and Mrs. Taylor called at decedent's home November 30th and December 1st, and that on November 30th, Mrs. Taylor told her she was about to prepare a will for decedent and sent her (Mrs. Albers) from the room while she discussed the terms of the will with decedent and then told Mrs. Albers she would typewrite the will and come the next day to have it signed; that Mrs. Taylor and Mrs. Cowan came the next day but the will was not signed then because she (Mrs. Albers) was in decedent's room the whole time they were there and no paper was signed. The alleged will is in Mrs. Taylor's handwriting and she testified she was not at decedent's home November 30th. If Mrs. Alber's testimony is true, the decedent never made his mark on any will, or if he did, he made it November 30th.

"2. Mrs. Taylor says she came to decedent's home December 1st to attend the execution of the Schellhorn will. Knowing that one had been prepared which probably contained the decedent's instructions, it was quite unnecessary for her to prepare another, unless the decedent's physical condition in-

dicated that he could not live until the next day to execute the prepared will, or unless she feared that the provisions of the Schellhorn will would not be to her liking.

"3. Schellhorn had not made an appointment to meet Mrs. Cowan and Mrs. Taylor at decedent's home December 1st. He had gone there that day with his prepared will and his brother was with him to act as the second witness if the decedent was in condition to execute the will. Mrs. Taylor did not go to decedent's home December 1st to witness the execution of Schellhorn's will, but to have decedent execute a will drawn by herself.

"4. On November 30th, or December 1st, Mrs. Cowan and Mrs. Taylor had agreed, at Schellhorn's request, to meet him at decedent's home December 3d to execute the will Schellhorn had prepared, but on December 3d Schellhorn believed the decedent incapable of executing a will and he called on Mrs. Taylor and Mrs. Cowan that day and told them not to keep the appointment; they did not tell him they had in their possession at that moment a will executed by decedent two days previous.

"5. On December 11th Schellhorn called on Mrs. Cowan and Mrs. Taylor, being unaware of the alleged will of December 1st, and believing that decedent had died intestate and discussed with them an application for letters of administration on decedent's estate; they joined with him in that discussion and did not tell him that decedent had executed a will December 1st.

"6. Mrs. Cowan and Mrs. Taylor did not speak truly when they said they went to decedent's home December 1st to witness the execution of a will already prepared and with no intention of then preparing one, because Schellhorn had no appointment with them to produce his will that day and also because Mrs. Taylor took with her writing paper, a fountain pen, her notarial seal and a legal form book, which book she used in the preparation of a will. In her main testimony direct and cross, she did not disclose that she had taken this book with her and it was not until the end of the third trial day when she was giving rebuttal testimony, that a chance

question on cross-examination brought out the fact. I believe that when she learned, November 30th or December 1st, that decedent was expected to execute a will December 3d, she went to decedent's home with the deliberate intention of preparing a will of her own liking and of inducing him to affix his mark thereto. That he did affix his mark to her will depends entirely upon the testimony of of her mother and herself.

"7. The decedent did not have testamentary capacity December 1st. He was then incapable of recollecting of what his property consisted or to understand what disposition he wanted to make of it. Mrs. Albers says that from November 30th to the day he died, his condition grew progressively worse and that on the night of December 1st he was but semi-conscious. His attending physician, Dr. Weiss, who visited him the evening of November 30th, says that he was then in a semi-comatose condition, unable to respond to ordinary questions, or to hold a thermometer in his mouth; that questions put to him brought only mumbling replies—just a grunting sound and that he thought decedent was about to die and recommended that he be sent to a hospital; that he called again December 3d and found him in a much worse condition; that between November 30th and December 3d he was incapable of transacting any business and that he died December 5th from uremia and senility. Schellhorn, an apparently disinterested witness, says he called on decedent November 30th, December 1st, 2d, 3d and 5th, and that on none of those dates was decedent mentally or physically capable of executing a will; that he spoke to decedent on each of those occasions and was not recognized and that decedent did not respond in any way to his greetings or questions. Dr. Stubenrauch, acting for the city physician, called on decedent December 2d and 3d and advised that he be taken to a hospital; that although decedent was not unconscious, he made no attempt to speak to decedent on either occasion and once saw him raised up in bed to drink water from a glass which had to be supported in his hands. These are all the witnesses who saw decedent between November 30th and

December 5th, except Mrs. Cowan and Mrs. Taylor who saw him the night of December 1st, and on two subsequent days. Mrs. Cowan and Mrs. Taylor only testified as to his condition during the time they were with him from about eight P. M. to ten-thirty P. M., December 1st. From all the testimony it seems clear that decedent was mentally incompetent to make a will at any time between November 30th and December 5th, unless Mrs. Cowan and Mrs. Taylor can be believed that in the few hours they were alone with him December 1st, he had a lucid interval and I am not satisfied to rely upon their unsupported testimony to establish that fact, especially in view of the testimony of Mrs. Albers that decedent was only semi-conscious the night of December 1st and the testimony of Schellhorn that he called to see decedent twice that day, the second time being about five-thirty P. M., and that both times he found decedent unable to speak to or recognize him. It might be added that besides Dr. Weiss' testimony is that of Dr. King, a medical expert called by the caveatrix, that a man with the symptoms described by Dr. Weiss was not competent to make a will December 1st.

"Further, I think if the will was executed, it was the product of undue influence and was executed without the benefit of independent and disinterested advice. The decedent was handicapped by age and loss of sight and was suffering from an illness which was serious at the date of the alleged will, because it caused his death four days later; he was then a fit subject for influence by one in whom he trusted. I have heretofore referred to the probable interest the persons who drew and witnessed the will have in its provisions. The testimony does not show that the decedent expected Schellhorn to come with his will the night of December 1st, or that he became restless or annoyed when, according to Mrs. Cowan and Mrs. Taylor, Schellhorn failed to appear. He did not then request Mrs. Taylor to draw his will—she was a volunteer who substituted her will for the one decedent had told Schellhorn to prepare at a time when he was competent to consider and decide what disposition he desired to make of his property. The will offered for probate is not one that a

competent and disinterested person would have advised decedent to execute. True, it leaves his whole estate to his wife but her death is a matter of but a few years and thereafter it is probable that no part of the estate will go to his blood. An attempt was made to show that decedent had a grievance against his only child, but it was not serious and no reason appears why he should cut her and his granddaughter off from all share in his estate. A competent and independent person would have advised decedent to leave his estate in trust for his wife for her life and after her death, to his daughter and granddaughter. Assume that he told Mrs. Taylor he wanted to leave everything to his wife, he could not have understood the effect of such a gift to a mentally incompetent woman of eighty-four years of age and what would happen to his estate on her death and it does not appear that Mrs. Taylor advised him thereof. Besides suggesting that she draw a will for him, Mrs. Taylor also suggested that he name her husband as his executor. The latter suggestion which she lodged in his mind, strengthened further the hold which her grandmother and her mother have under the will on the feeble old decedent's property. If she was able to induce decedent to execute a will and to name her husband as his executor, she was also able to induce him to adopt any suggestion she might offer as to the disposition of his estate.

"I am of the opinion that on all the evidence, probate should have been denied to the will in question and I shall advise a decree reversing the orphans court."

*Messrs. Gross & Gross,* for proctors of proponent-appellant.

*Messrs. Fredman & Fredman,* for proctors of Christina Albers, appellee.

*Mr. Lewis B. Eastmead,* for proctors of Alice Kuhn, appellee.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion delivered by Vice-Ordinary Fielder in the prerogative court.

For affirmance—The Chief-Justice, Trenchard, Parker, Lloyd, Case, Bodine, Donges, Heher, Perskie, Van Buskirk, Kays, Hetfield, Dear, Wells, Dill, JJ. 15.

For reversal—None.